419 A.2d 457

COMMONWEALTH of Pennsylvania, Appellant,

v.

Theresa BARONE.

COMMONWEALTH of Pennsylvania

v.

Theresa BARONE, Appellant.

Superior Court of Pennsylvania.

Argued Sept. 13, 1979.

Filed Jan. 25, 1980.

284

Wallace A. Murray, Norristown, for appellant at No. 1950 and appellee at No. 1805.

Ronald Williamson, Assistant District Attorney, Norristown, for Commonwealth, appellee at No. 1950 and appellant at No. 1805.

Before CERCONE, President Judge, and PRICE, SPAETH, HESTER, WIEAND, CAVANAUGH and HOFF-MAN, JJ.*

CERCONE, President Judge:

The Commonwealth brings the instant appeal from the trial court's order granting of appellee's demurrer to the charge of homicide by vehicle, Motor Vehicle Code, 75 Pa. C.S. § 3732 (1977).[1] Ms. Barone filed a cross–appeal challenging an earlier order of court dismissing various of her earlier petitions and motions attacking the constitutionality of this statute. Albeit for different reasons, the majority of this Court agree that the order of the trial court discharging appellant should be affirmed.

■ Section 3732 of the Motor Vehicle Code provides: Any person who unintentionally causes the death of another person while engaged in the violation of any law of this Commonwealth or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic is guilty of homicide by vehicle, a misdemeanor of the first degree, when the violation is the cause of death.

The Commonwealth argues and the Dissent agrees that the words of this provision are precise and unambiguous. From this the Commonwealth further reasons that this statute unequivocally evidences a legislative intent to impose the severe penal sanctions of up to five years imprisonment[2] and a possible fine, on drivers who, *no matter how unintentionally*, cause a death while operating a vehicle in violation of *any* statewide or municipal rule regulating operation or use of an auto. In our opinion, the above language is not susceptible to such a "plain meaning" approach. After having examined the legislative history of this enactment, we would hold that the legislature intended to select culpable negligence as defined in the Crimes Code, 18 Pa.C.S. § 302(b)(4) (1973), as its touchstone for punishment.

* Judge DONALD E. WIEAND is sitting by special designation.

1. Hereinafter: Motor Vehicle Code § ――.

2. *See* Crimes Code, 18 Pa.C.S. § 1104(1) (1973).

I.

## Constitutional Challenges to Section 3732

On this cross–appeal from the lower court's refusal to hold section 3732 unconstitutional, the appellee, Ms. Barone, advances three contentions. Ms. Barone urges that section 3732 runs afoul of the Due Process Clause of the United States Constitution inasmuch as it is vague and overbroad, omits to require as an essential element of the offense some degree of "fault" or *mens rea,* and denies the accused the right to have all charges disposed of at the magistrates level. This latter invalidity is said to stem from the procedure made applicable to a section 3732 prosecution under our Supreme Court's decision in *Commonwealth v. Campana.*[3] For the reasons which follow, we need only concern ourselves with the latter constitutional challenge.

a.

In evaluating Ms. Barone's assertions, we are initially guided by certain well settled principles of appellate review of constitutional questions. Thus, it is beyond cavil that this court will not *sua sponte* raise constitutional questions which have not been framed by the parties. *E. g., Wiegand v. Wiegand,* 226 Pa.Super. 278, 310 A.2d 426, *rev'd* 461 Pa. 482, 337 A.2d 256 (1975). Nor should we address constitutional issues unnecessarily[4] or when not properly presented and preserved in the lower court for our appellate review.[5]

3. 452 Pa. 233, 304 A.2d 432, *vacated and remanded,* 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44 (1973), *on remand,* 455 Pa. 622, 314 A.2d 854, *cert. denied,* 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974).

4. *E. g., Commonwealth v. Allsup,* 481 Pa. 313, 317, 392 A.2d 1309 (1978); *Mt. Lebanon v. County Board of Elections,* 470 Pa. 317, 322, 368 A.2d 648 (1977); *Commonwealth v. Pocard,* 296 Pa. 120, 145 A. 794 (1929); *Commonwealth v. Rutherford,* 252 Pa.Super. 348, 349, 381 A.2d 952, 953 (1977).

5. *E. g., Commonwealth v. Logan,* 468 Pa. 424, 364 A.2d 266, 268 (1976) (waiver of Fifth Amendment rights); *Commonwealth v. Jackson,* 239 Pa.Super. 121, 362 A.2d 324 (1976) (waiver of Fifth Amendment rights); *Commonwealth v. Bryant,* 461 Pa. 309, 336 A.2d 300 (1975) (waiver of Fourth Amendment rights); *Commonwealth v. Sistrunk,* 460 Pa. 655, 334 A.2d 280 (1975) (waiver of Fourteenth

Presently, application of these principles compels the conclusion that only one constitutional question has been properly preserved for our review.

On September 14, 1977, Ms. Barone was accorded a preliminary arraignment which was followed by a preliminary hearing on September 28, 1977. Subsequently, on October 17, 1977, Ms. Barone filed both a *motion* to quash the complaint on non–constitutional grounds and a separate *petition* seeking a declaration of the unconstitutionality of section 3732. The motion to quash omitted all reference to the alleged unconstitutionality of section 3732. The petition alleged only a deprivation of due process by virtue of the procedure mandated by *Commonwealth v. Campana*. The alternative constitutional attacks on the two theories of vagueness and overbreadth and lack of *mens rea* were not filed until January 10, 1978, and April 24, 1978, respectively. During the period between these latter two petitions, the Honorable Robert W. Tredinnick on April 7, 1978, dismissed Ms. Barone's constitutional forays. Presumably, this order only addressed the alleged denial of procedural due process and the vagueness and overbreadth contentions.

To complicate matters, in its answer to Ms. Barone's petition of April 24, 1978, the Commonwealth maintained that Ms. Barone had waived any grounds for relief bottomed upon the unconstitutionality of the statute which had not been raised in the original petition. *See* Record at 23a. Later, at oral argument on this petition, the Commonwealth reasserted its objection. *See* Record at 38a and 39a. The lower court *apparently* agreed with the Commonwealth's analysis and refused to address the merits of the last petition. *See* Record at 40a.

Amendment rights); *Commonwealth v. Piper*, 458 Pa. 307, 328 A.2d 845 (1974) (waiver of claim that statute violated equal protection clause); *Commonwealth v. Powell*, 459 Pa. 253, 328 A.2d 507 (1974) (waiver of Sixth Amendment rights); *Commonwealth v. Roundtree*, 458 Pa. 351, 326 A.2d 285 (1974) (waiver of Sixth Amendment rights); *Commonwealth v. Coades*, 260 Pa.Super. 327, 394 A.2d 575 (1978) (waiver of Fourth Amendment rights); *Commonwealth v. Rutherford*, 252 Pa.Super. 348, 381 A.2d 952 (1977) (waiver of Sixth Amendment rights). *See also, Estelle v. Williams*, 425 U.S. 501, 508 n.3, 96 S.Ct. 1691, 1695, 48 L.Ed.2d 126 (1976).

Pennsylvania Rule of Criminal Procedure 304 (eff. version January 1, 1965)[6] provides in relevant part:

"(a) All pre–trial applications for relief shall be in writing and presented under the name and style of application.

. . . . .

(e) All grounds for the relief demanded shall be stated in the application and failure to state a ground shall constitute a waiver thereof.

In principle, this Rule initially allows the filing of separate applications for relief, that is, a motion to quash and a petition to declare unconstitutional,[7] but it does not grant an accused a license to omit grounds of attack which are essentially related to and encompassed within the subject matter of the initial applications. *See Commonwealth v. Coades*, 260 Pa.Super. 327, 330, 394 A.2d 575, 577 (1978). The first petition contesting the constitutionality of section 3732 omitted any reference to "vagueness" or lack of a *mens rea*. Ms. Barone's counsel, who had represented her since the preliminary arraignment, offered no explanation to the courts below as to why these other alleged constitutional deficiencies were not contained in the first petition. Moreover, he failed to argue in response to the Commonwealth's answer that he was unaware of these other facial grounds of constitutional invalidity at the time the first application was filed. The dictates of Rule 304 are clear. We have held that it does not permit an accused to sit back and take chances on one ground for relief and afterwards *willy nilly* advance other similar grounds, hoping to get a favorable disposition at some indeterminate point in the pre–trial future. *Coades*, 260 Pa.Super. at 330, 394 A.2d at 577. This tactic cannot be tolerated within the concept of orderly administration of criminal justice in trial and appellate courts. Thus, we would hold that an unexcused failure to

6. Rule 304 was later amended and renumbered to Rule 306. The amended version, however, need not concern us as it became effective only in cases in which the information or indictment was filed on or after January 1, 1978.

7. *But see* Pa.R.Crim.P. 306(a) (1978).

raise the alternative constitutional theories in the original petitions amounted to "a waiver thereof." Pa.R.Crim.P. 304.

b.

Thus, Ms. Barone's sole constitutional argument rests on her claim she was denied due process of law because "she was not afforded the opportunity to have all charges quickly disposed of at the magistrates level." More specifically, Ms. Barone boldly asserts, with no citation of authority, that where, as here, a summary offense is an essential element of the charged indictable offense, an accused is absolutely entitled to a finding of guilty or not guilty on the summary offense. Insofar as the Dissenting opinion finds this hypothesis to be devoid of merit, we agree.[8]

II.

Turning to the merits of the Commonwealth's appeal from the lower tribunal's granting of Ms. Barone's demurrer,[9] the questions presented seek an answer to what are the material elements of a section 3732 offense, and what, if

8. *Commonwealth v. Campana, supra,* acknowledged that "[w]here an individual is charged with a summary and an indictable offense arisi g out of the same facts and is held for court on the later charge," it is permissible for a magistrate to hold all charges for disposition at one common pleas proceeding. *Campana,* 452 Pa. at 253, 304 A.2d at 442. *Cf. Commonwealth v. Ray,* 448 Pa. 307, 309 n.3, 292 A.2d 410, 412 n.3 (1972). This doctrine was later incorporated into the Pennsylvania Rules of Criminal Procedure by amendment. *See* Pa.R.Crim.P. 51, Comment (1975). *See also* Pa.R.Crim.P. 101, Comment (1975). Since by force of this amendment the above class of cases must proceed as court cases, the accused is not *guaranteed* a *disposition* other than that provided in Pa.R.Crim.P. 143 (1974). More fundamentally, we perceive no conflict between the teachings of *Campana,* the above Rules, and the accused's fundamental rights as guaranteed by the Due Process Clause of the United States Constitution. In any event, Ms. Barone has cited *not* one case, nor has our independent research unearthed one, which has so construed the rights and privileges secured to the accused by the fourteenth amendment.

9. It is beyond question that the Commonwealth has the right to appeal from a lower court order sustaining this type of demurrer. *E. g., Commonwealth v. Long,* 467 Pa. 98, 354 A.2d 569 (1976); *Commonwealth v. Trainor,* 252 Pa.Super. 332, 381 A.2d 944 (1977); *Commonwealth v. Bey,* 221 Pa.Super. 405, 292 A.2d 519 (1972).

any, degree of culpability must accompany the elements. The Dissent would rule that the minimum culpability requirements of the Crimes Code, 18 Pa.C.S. § 302(a) (1973) are not applicable to any of the essential elements of a section 3732 offense as "a legislative purpose to impose absolute liability [for any death resulting from violation of any traffic law] plainly appears." Crimes Code, 18 Pa.C.S. § 305(a)(2) (1973). As we are unable to find the same clarity in the words employed, we cannot agree with Dissent's treatment and disposition of this question.

Logically, in adjudging whether the culpability requirements of section 302(a) are applicable to any of the material elements of a section 3732 offense, analysis should commence with section 305 which generally governs the scope of section 302(a). Section 305 provides in pertinent part:

"(a) The requirements of culpability prescribed by . . . Section 302 of this title . . . do not apply to: (2) offenses defined by statutes other than this title, insofar as a legislative purpose to impose absolute liability for such offenses or with respect to any material element thereof plainly appears.

This section of the Crimes Code is essentially identical to the parallel provision of the Model Penal Code, § 205(1)(b) (1962). The Comments to this proviso expressly observe "[t]hat this section makes a *frontal attack* on absolute or strict liability in penal law, whenever the offense carries a possibility of sentence of imprisonment." Model Penal Code, § 2.05, Comment 1 (Tent. Draft No. 4, 1955) (emphasis added). Implementation of this strong common law tradition against strict penal responsibility [10] is found in the Code's commandment that legislation should not be found to impose strict liability unless a legislative intent to do so

10. *See* Packer, *Mens Rea and the Supreme Court*, Sup.Ct.Rev. 107, 109 (1962); Hart, *The Aims of the Criminal Law*, 23 Law & Contemp. Prob. 401 (1958); Stallybrass, *The Eclipse of Mens Rea*, 52 L.Q.R. 60 (1936). *See also* J. Hall, General Principles of Criminal Law 327–31 (2d ed. 1960); R. Perkins, Criminal Law 81 (2d ed. 1969); G. Williams, Criminal Law: The General Part §§ 70–76 (2d ed. 1961). *See generally, Morissette v. United States*, 342 U.S. 246, 250–60, 72 S.Ct. 240, 243–248, 96 L.Ed. 288 (1952).

"plainly appears." With this in mind, our Court should not liberally apply this "plainly appears" test, but rather should carefully scrutinize the legislature's use of any settled terms which have heretofore been commonly associated with "fault."

The above approach, however, is not novel to Pennsylvania appellate courts. Our courts, as the Dissent correctly points out, have customarily adhered to the following principles of statutory construction 1) When the legislature employs language which is plain and unambiguous, there is no longer justification to resort to the rules of statutory construction; [11] 2) In deciding whether a word or phrase is plain and unambiguous within the meaning of the above principle, an appellate court is to construe the word or phrase in accordance with its common and approved usage and [12]; 3) If our legislature has utilized a word or phrase which is centuries old in our common law jurisprudence, we must interpret it consistently with its heritage in our legal traditions.[13]

I begin with the words that are used to delineate the offense in this case. *E. g., In re North Am. Rayon Corp.,* 383 Pa. 428, 430, 119 A.2d 205, 207 (1956). *See Commonwealth ex rel. Cerminara v. Cerminara,* 239 Pa.Super. 111, 115–117, 362 A.2d 1011, 1014–15 (1976). The critical word in the title is "homicide." In this Commonwealth, our court has uniformly interpreted enactments which carry this solemn title as requiring that the voluntary act which caused

11. *E. g., Hellertown Mfg. Co. v. Commonwealth,* 480 Pa. 358, 390 A.2d 732 (1978); *Commonwealth v. Rieck Inv. Corp.,* 419 Pa. 52, 213 A.2d 277 (1965); *Daugherty v. Continental Can Co., Inc.,* 226 Pa.Super. 342, 313 A.2d 276 (1973); *In re Pittsburgh Beer Corp.,* 216 Pa.Super. 71, 260 A.2d 493 (1969).

12. Statutory Construction Act, 1 Pa.C.S. § 1903 (Supp.1978–79). *E. g. Commonwealth v. Hill,* 481 Pa. 37, 391 A.2d 1303 (1978); *Commonwealth v. Simione,* 447 Pa. 473, 291 A.2d 764 (1972); *Commonwealth v. Hughes,* 268 Pa.Super. 536, 408 A.2d 1132 (1979); *Commonwealth v. Sojourner,* 268 Pa.Super. 488, 408 A.2d 1108 (1979).

13. *E. g., Appeal of Ryder,* 365 Pa. 149, 74 A.2d 123 (1950); *Appeal of Subers,* 173 Pa.Super. 558, 98 A.2d 639 (1953); *Smoekar v. Jones & Laughlin Steel Corp.,* 137 Pa.Super. 183, 8 A.2d 461 (1939).

the death be done with some degree of fault, that is, intentionally, knowingly, recklessly, or more recently negligently. The legislature has further provided that the "homicide" which is punishable is that which is caused "unintentionally" while operating a motor vehicle. Taken in context, "unintentional" [14] plainly means only that the conduct causing the death was not done purposely or with design.[15] It neither plainly negatives the above understanding of the term "homicide" nor does it modify the phrase "while engaged in the violation of any law of this Commonwealth or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic" in such an unambiguous manner as to preclude a judgment that the violation must still be "negligent." Viewed from this perspective, the above words and phrases could be read as either evidencing a legislative purpose to impose strict criminal responsibility or to fix accountability only for negligent violations. In our opinion, the plain meaning analysis of both the Dissent and Judge Spaeth's Concurring Opinion have obscured a simple fact. In civil law, the dual purpose for employing criminal statutory violations as standards is both to compensate the innocent victim and to deter the actor from repeating the harm causing act or omission.[16] The criminal statute which serves as the index, however, does not share this compensation function, but rather is customarily drafted to protect the public at large from the conduct it prohibits. Underlying the criminal statute is the notion that punishment is necessary in order to reform or teach the accused not to repeat the offense and to deter others from imitating him. With regard to this particular

14. 10 New English Dictionary 230 (1926) defines unintentional as "[n]ot done with, not arising from intention . . . [n]ot acting with intention.

15. 5 New English Dictionary 379 (1926) defines intentional as: "[D]one on purpose, resulting from intention; intended. . . ."

16. In a civil context, it is beyond cavil that not every violation of a criminal statute or ordinance should or will subject the inadvertent violator to even civil sanctions let alone imprisonment. *See generally* W. Prosser, Torts § 36, at 170–204 (4th ed. 1971).

statute, if the ultimate goal is to protect the public from imprudent driver conduct, then what purpose is to be served by punishing an operator who may have acted reasonably and prudently under the circumstances. To demonstrate, failing to adhere to the left-right-left rule when merging into traffic involves more risk to others; however, in a civil action a jury of the defendant's peers may find that it was not unreasonable to omit to observe this rule when the defendant is rushing an injured person to a hospital. To hold, as the Dissent does, that this same defendant may be criminally punished without reference to his state of mind simply does not make sense. If, with reference to the accused's evaluation of and perception of the operative factors, his conduct conforms to what is socially acceptable under the same or similar circumstances, how does this mark him as one who needs to suffer punishment?[17] Does this statute envision punishing such an operator or separating him from his family and the remainder of society for five years? Does it seek to reduce traffic fatalities by deterring operators from exercising such care in the future? We surmise that it does not. Accordingly, we must reject the Dissent's plain meaning analysis and move to the Statutory Construction Act, 1 Pa.C.S. § 1501 *et seq.* (Supp.1978–79), for further guidance in answering the question *sub judice.*

a.

Where, as here, we determine that the words or phrases of an act are equivocal or ambiguous, legislative intention may be ascertained by examining the circumstances which surrounded enactment, the harm sought to be regulated and prevented, the object sought to be obtained, the consequences of any particular construction, and the germane legislative history. 1 Pa.C.S. § 1921(c)(1)–(7) (Supp.1978–79). *E. g., Casey v. Pa. State Univ.,* 463 Pa. 606, 345 A.2d 695 (1975); *Pa. Labor Relations Bd. v. State College Area School Dist.,* 461 Pa. 494, 337 A.2d 262 (1975); *Commonwealth ex rel. Reed v. Maroney,* 194 Pa.Super. 514,

17. *See* Packer, *Mens Rea and the Supreme Court,* 1962.

168 A.2d 800, *cert. denied*, 368 U.S. 907, 82 S.Ct. 187, 7 L.Ed.2d 100 (1961).

### *Circumstances Surrounding Enactment* [18]

In 1966 Congress passed the Highway Safety Act of 1966, 23 U.S.C. § 401 *et seq.* (1970). This act authorized the United States Secretary of Transportation to adopt standards for all state highway safety programs. Pursuant to this mandate, the Secretary promulgated a standard on "Codes and Laws." This standard required all states to conduct comparative traffic law studies which would eventually be used to yield state legislation providing for uniform rules of the road within each state and the nation. Variations in state law were to be detected by comparing the states' current laws with the specimen provisions contained in the then effective version of the Uniform Vehicle Code § 11–101 *et seq.* (rev. ed. 1962).[19] *See* 33 Fed.Reg. 16,562 (1968). The states' progress in embracing this standard was to be monitored by the United States Department of Transportation.

The initial report was published in January of 1973. The report revealed that Pennsylvania's traffic laws were among the most outdated and non-uniform in the United States. Employing the provisions of the U.V.C. as the norm, the study ranked Pennsylvania 49 out of 51 jurisdictions. *See* United States Department of Transportation, National Committee on Uniform Traffic Laws and Ordinances, Contemporary Overview of Traffic Law Uniformity in the United States 9 (1973). Alarmed by the consequences of failing to comply with the standard,[20] the Pennsylvania Department of Justice secured a Federal Highway-Safety Grant to finance research on a proposed revision of the Motor Vehicle Code.

**18.** *See* 1 Pa.C.S. § 1921(c)(1) (Supp.1978–79).

**19.** Hereinafter: U.V.C. § ——.

**20.** Failure to meet any standard under the Act could have resulted in a ten percent reduction in federally allocated highway building funds and a loss of all funds available under the Highway Safety Act.

*See* E. Morris & I. Packel, Rules of the Road, at IV (1974).[21] *See generally* Kearney, *Pennsylvania's Obsolete Traffic Laws*, 44 Pa.B.A.Q. 561 (1973).[22] In retrospect, therefore, the subject legislation was not an isolated amendment to the Motor Vehicle Code motivated solely by the carnage on our roadways and the "inadequacy" of our involuntary manslaughter statute. Rather, the vehicular homicide proviso was but one aspect of a massive overhauling of all Pennsylvania rules of the road.

*Harm to be remedied and object sought to be obtained.*[23]

As alluded to above, the primary legislative intent in revising the rules of the road chapter of the Motor Vehicle Code was to eliminate highway accidents and delays which were due in large degree to both Pennsylvania and non-resident operators proceeding on the highways on the basis of different and obsolete rules of driver conduct. *See* Morris & Packel, *supra*, at 1. Regarding the legislation *sub judice*, the prime object sought to be obtained was no different than that which provoked the modernization of all the rules of the road, *i. e.*, uniformity. Not surprisingly, therefore, the legislature turned to the U.V.C. as a model for its homicide by vehicle provision. *Id.* at 186. Of course, as the Dissent observes, there were additional possible reasons why the legislature chose to enact a distinct offense governing vehicular homicides. Foremost among these other reasons might have been a desire to reduce the fatalities on our roadways, and a corresponding recognition of the limited utility of our involuntary manslaughter statute in coping with the problem. *Id.* However, both of these weighty concerns are not jeopardized by reading the subject statute as not dispensing with the requirement that the harm causing violation must nevertheless be culpable. More directly, to credit the legislature with an intent to deter life endangering conduct on our roadways is to acknowledge that in order for punish-

**21.** Hereinafter: Morris & Packel.

**22.** Hereinafter: Kearney.

**23.** *See* 1 Pa.C.S. § 1921(c)(6) (Supp.1978–79).

ment to be efficacious and just under his provision, it must be predicated upon the accused's awareness of the factors which made his conduct criminal. Thus, conviction, punishment, and sentence may well provide inadvertent violators with an additional incentive to take more care in both evaluating the risks they consciously create and those which they unreasonably fail to perceive. In either case, however, the assumption which underlies the punishment is that the actor ignored the operative factors in creating a risk of harm to others. Confronted with imprisonment, the violator may indeed think twice prior to speeding through a densely populated neighborhood. On the other hand, to suggest as the Dissent does that our legislature intentionally chose to disregard the social utility of the driver's conduct is to impute to the legislature a harshness and shortsightedness which we cannot. While there is always some risk associated with driving an auto, we do not think that the legislature in its collective wisdom intended to abrogate the possibility of a finding that the risk taken was reasonable under the particular circumstances.

## Other Statutes [24]

Nor do the supposed shortcomings of our involuntary manslaughter statute alone justify a determination that the vehicular homicide proviso was intended to create strict criminal responsibility. This Court has recently ruled that the convenience of investigation and prosecution is not the polestar in ascertaining what the essential elements of an offense are or what degree of culpability must accompany them. *E. g., Commonwealth v. Hughes,* 268 Pa.Super. 536, 408 A.2d 1132; *Commonwealth v. Sojourner,* 268 Pa.Super. 488, 408 A.2d 1108 (1979). We concede that the history of this proviso confirms a legislative judgment that a distinct offense was needed due to the reluctance of juries to convict for involuntary manslaughter in fatal traffic accident cases, *see* Morris & Packel, *supra,* at 186; however, we dispute that this history supports the further proposition that as a result of this difficulty the legislature threw in the proverbial

24. *See* 1 Pa.C.S. § 1921(c)(5) (Supp.1978–79).

towel and deemed it essential to punish every violator no matter how reasonable his conduct. Faced with this difficulty, we reason that the legislature intended to adopt an intermediate response.

It is true that under the present involuntary manslaughter statute a negligent operator completely escapes any criminal punishment unless the violation which precipitated death was perpetrated "in a reckless or grossly negligent manner." Crimes Code, 18 Pa.C.S. § 2504 (1973).[25] We suggest that the legislature intended to fill this void not by punishing every death causing violation, but rather only intended to reach those violations in which there has been a "gross deviation" from the required standard of care. See Crimes Code, 18 Pa.C.S. § 302(b)(4) (1973).[26] To hold otherwise is to completely confuse and obscure the distinctions between legality, justification, excuse, and culpability in the law of vehicular homicide. In passing this statute, we do not discern that the legislature abandoned its heretofore sensitive approach to the law of homicide generally. We read the subject provision as merely supplementing the already existing law as relates to deaths caused by Motor Vehicle Code violations. Thus, this provision being within this general conceptual framework, it continues to recognize that Motor Vehicle Code violations may involve differing species of culpability. For example, it is more aggravating to cause a death through an intentional violation rather than reckless, and worse to bring it about through reckless violation than

**25.** Otherwise stated:
"to sustain a conviction of involuntary manslaughter for a death resulting from an act which constitutes a transgression of the Motor Vehicle Code, it must be established that such violation in itself, or together with the surrounding circumstances, evidence a disregard of human life or an indifference to consequences."
*Trainor*, 252 Pa.Super. at 337, 381 A.2d at 947 (citations omitted).

**26.** We are not unmindful of the difficulty of the jury's discriminating between recklessness and negligence when both of the above statutory offenses are submitted for its consideration. We are, however, confident that our lower courts are capable of devising formulations which clarify the distinctions between the two mental states. *See* Model Penal Code, § 2.02, Comment at 124–28 (Tent. Draft No. 4 1955).

negligent violation. In the past, Pennsylvania law punished the former two, it did not punish the latter. The latter until now has been an innocent homicide. *E. g., Commonwealth v. Busler*, 445 Pa. 359, 361, 284 A.2d 783, 784 (1971); *Commonwealth v. Trainor*, 252 Pa.Super. 332, 337, 381 A.2d 944, 947 (1977). Accordingly, as the Dissent concedes there was a need for a new offense governing deaths resulting from negligent violations of the rules of the road. This is that measure and we would so hold.[27]

## IV.

The only remaining question is whether the trial court properly sustained Ms. Barone's demurrer to the charge. In reviewing the propriety of this action, "the test to be applied . . . is whether the evidence of record and the inferences reasonably drawn therefrom would support a guilty verdict, and in making our determination we must read the evidence in the light most favorable to the Commonwealth." *Commonwealth v. Trainor*, 252 Pa.Super. 332, 334, 381 A.2d 944, 945 (1977) (quoting with approval from *Commonwealth v. Bey*, 221 Pa.Super. 405, 406, 292 A.2d 519, 520 (1976). Instantly, the focus of our inquiry is whether the Commonwealth's evidence was sufficient to prove beyond a reasonable doubt that Ms. Barone's conduct

27. Parenthetically, while our version of the provision on vehicular homicide does not expressly refer us to other jurisdictions for guidance in construing it, *compare Commonwealth v. Sojourner, supra,* the absence of such a directive does not prohibit such an inquiry. *See* 1 Pa.C.S. § 1927 (Supp.1978–79). I am, however, perplexed by the Dissent's interpretation of the history of this section in other jurisdictions. The Dissent in finding support for it's result totally ignores three important points: (1) The statutory schemes in the overwhelming majority of these jurisdictions is different from Pennsylvania's; *see* National Committee on Uniform Traffic Laws and Ordinances, *Traffic Law Annotated,* § 11–903, Comment (1972 & Supp.1976); (2) These same jurisdictions either expressly or impliedly have chosen to adhere to the principle that the violation must be culpable at least where imprisonment and a fine are permissible sanctions, *see id.,* and; (3) There is obvious reason why our legislature did not expressly provide that the violation must be reckless, that is, a reckless violation would subject the accused to prosecution under our involuntary manslaughter statute. *See* 18 Pa.C.S. § 2504 (1973).

amounted to "a gross deviation from the standard of care that a reasonable person would observe in [her] situation." Crimes Code, 18 Pa.C.S. § 302(b)(4) (1973).

■ Thus viewed, the Commonwealth adduced the following. On September 14, 1977, Ms. Barone was on route to her place of employment in a two–door, brown Toyota. At approximately 8:00 a. m. she arrived at the intersection of Bethel Grant Road and Morris Road in Upper Gwynedd Township, Montgomery County. The weather was clear and the roadways dry. As she approached the intersection, she observed a stop sign and initially obeyed its command to come to a complete stop. As is often the case at a major thoroughfare during this time of day, traffic was heavy. She observed this traffic for approximately two to three minutes waiting for an opportunity to safely cross the intersection. Subsequently, Ms. Barone apparently either failed to look to her right or misjudged the distance and rate of speed of the oncoming traffic and proceeded into the intersection. While in the intersection her auto was struck by a motorcycle resulting in the motorcycle operator's death. Commonwealth witnesses also testified that prior to impact Ms. Barone neither sounded her horn nor did she apply her brakes in an effort to avoid the collision. We are persuaded that based upon the above the jury could not have properly found that Ms. Barone's actions amounted to "a gross deviation from the standard of care that a reasonable person would observe in [her] situation." We are convinced that no jury of reasonable men and women could have found a gross deviation from the applicable standard of care in light of the undisputed fact that Ms. Barone waited patiently at the stop sign for several minutes before proceeding into the intersection. Under these circumstances, such conduct could not have established a violation of section 3732.

Accordingly, we would affirm the lower court's determination that the above evidence was not sufficient to go to the jury.

Order affirmed and defendant discharged.

SPAETH, J., files a concurring opinion in which HOFF-MAN, J., joins.

WIEAND, J., files a dissenting opinion in which PRICE and HESTER, JJ., join.

SPAETH, Judge, concurring:

It is clear from the evidence that the Commonwealth did not prove recklessness or gross negligence on the part of appellee. *See Commonwealth v. Busler*, 445 Pa. 359, 284 A.2d 783 (1971); *Commonwealth v. Clowser*, 212 Pa.Super. 208, 239 A.2d 870 (1968). Therefore, if the lower court was correct in construing the Act of June 17, 1976, P.L. 162, No. 81, § 1, 75 Pa.C.S. § 3732, as requiring proof of recklessness or gross negligence, the demurrer was properly sustained. *See Commonwealth v. Greer*, 232 Pa.Super. 448, 335 A.2d 770 (1975). If, however, the Commonwealth is correct in construing section 3732 as requiring nothing more than proof of a traffic violation causing death, then the evidence was sufficient to withstand the demurrer.[1]

1. Although the victim had the right of way, he had a duty to drive with due care and avoid the collision if he could. *See Maio v. Fahs*, 339 Pa. 180, 14 A.2d 105 (1940); *Rhinehart v. Jordan*, 313 Pa. 197, 169 A. 151 (1933); *MacDougall v. Chalmers*, 192 Pa.Super. 401, 162 A.2d 51 (1960). Evidence that the victim was contributorily negligent would not create a defense to the criminal charge. *See Commonwealth v. Clowser, supra*. However, the victim's actions may raise an issue with respect to causation. In *Commonwealth v. Root*, 403 Pa. 571, 170 A.2d 310 (1961), the Supreme Court rejected the tort concept of proximate cause as too broad to apply to a criminal case, *see Commonwealth v. Williams*, 133 Pa.Super. 104, 1 A.2d 812 (1938), and our cases have held that the contributory negligence of the victim may be relevant in determining the cause of death in a manslaughter case. *See Commonwealth v. Clowser, supra; see also Commonwealth v. Sisca*, 245 Pa.Super. 125, 369 A.2d 325 (1976).

In this case it is significant to note that the Commonwealth's evidence showed that the victim's motorcycle struck appellee's automobile. The Commonwealth's own case thus raised the question of whether the victim had fulfilled his duty to drive with due care and avoid the collision if he could. The Commonwealth also presented evidence, however, that the victim was not traveling at an excessive speed and that the collision occurred within seconds after appellee entered the intersection. On demurrer, this evidence permitted the reasonable inference that the victim was not at fault in not avoiding the collision and thus was not the cause of his own death.

Appellee argues that section 3732 should be construed to require proof of recklessness or gross negligence, as the lower court construed it. In the alternative, she argues that if section 3732 is construed to create strict criminal liability,[2] it is unconstitutional.[3] The dissent has concluded that section 3732 should be construed to create strict criminal liability, and I agree (although I regard the issue as exceedingly close, and respect the President Judge's contrary conclusion). The dissent has also concluded, however, that as so construed, section 3732 is constitutional, and as to this, I disagree; in my opinion, section 3732 represents a violation of due process, perhaps not under the federal constitution, but certainly under our state constitution.[4]

2. An argument may be made that section 3732 does not, by the Commonwealth's construction, impose strict liability but liability for negligence, the theory being that it is negligent for someone to violate a traffic law. However, a mere violation of a traffic law may not constitute even civil negligence, see *Commonwealth v. Clowser, supra*, 212 Pa.Super. at 214, 239 A.2d at 873, and definitely will not constitute criminal negligence as defined under section 302(b)(4) of the Crimes Code. *See* 18 Pa.C.S. § 302(b)(4) (criminal negligence is conduct that "involves a gross deviation from the standard of care that a reasonable person would use in the actor's situation"). Accordingly, if the Commonwealth's construction of section 3732 is correct, the section must be labelled a strict criminal liability section.

3. The Commonwealth maintained below that appellee's argument that section 3732 violates due process was waived as not timely raised. (R. 39a) The lower court made no finding of waiver, instead applying "the law of the case." (R. 40a) We need not decide either whether the lower court was correct or whether there was waiver. Since we may affirm on any ground, see *Commonwealth v. Shoatz,* 469 Pa. 545, 366 A.2d 1216 (1976); *Commonwealth v. Bartley,* 262 Pa.Super. 390, 396 A.2d 810 (1979); *Commonwealth v. Ditmore,* 242 Pa.Super. 248, 363 A.2d 1253 (1976), we may affirm the order discharging appellee, whatever the lower court's reason for the discharge, if discharge is required because section 3732 violates due process. Furthermore, the issue in this case is one of statutory construction. As discussed *infra,* pp. 470–472, that issue cannot be resolved without also resolving the issue of due process. *See Holdridge v. United States,* 282 F.2d 302, 310 (8th Cir. 1960); *Commonwealth v. Bready,* 220 Pa.Super. 157, 286 A.2d 654 (1971).

4. Article 1, section 9 of the Pennsylvania Constitution provides in pertinent part that "[i]n all criminal prosecutions the accused . . . cannot . . . be deprived of his life, liberty, or property, unless by the judgment of his peers or the law of the land." The term "law

## I

Statutes creating, or arguably creating, strict criminal liability have required the courts to engage in a distinctive analysis, not usual in the criminal law. Before examining the statute involved in the present case, therefore, it is important to review the cases, so that one may understand how this analysis has developed and what its distinctive features are. In conducting this review, it will be convenient to look first at the federal cases, and then at the cases decided by our Supreme Court and by this court.

## A

### *The Federal Cases*

"The existence of mens rea is the rule of, rather than the exception to, the principles of Anglo–American criminal jurisprudence." *Dennis v. United States*, 341 U.S. 494, 500, 71 S.Ct. 857, 862, 95 L.Ed. 1137 (1950). "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil."[5] *Morissette v. United States*, 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1951); *see Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). The concept of strict criminal liability is apparently of relatively

of the land" is the legal equivalent of the term "due process of law" in the federal constitution. *Eiffert v. Pennsylvania Central Brewing Co.*, 141 Pa.Super. 543, 15 A.2d 723 (1940). Due process of law is thus guaranteed under the state constitution as well as under the federal constitution. *Philadelphia Gas Works Co. v. City of Philadelphia*, 331 Pa. 321, 1 A.2d 156 (1938); *English v. North East Bd. of Educ.*, 22 Pa.Cmwlth. 240, 348 A.2d 494 (1975); *see Commonwealth v. Koczwara*, 397 Pa. 575, 155 A.2d 825 (1959).

5. In his chapter on the criminal law in THE COMMON LAW, Justice HOLMES remarked that "[e]ven a dog distinguishes between being stumbled over and being kicked." *Id.* at p. 3.

recent origin in our system of law,[6] and has been the subject of Supreme Court scrutiny on only a very few occasions.[7] In

6. *See* Sayre, Public Welfare Offenses, 33 Col.L.Rev. 55, 58–63 (1933). *And see Morissette v. United States, supra,* 342 U.S. at 250–57, 72 S.Ct. at 243–246.

7. The Court has consistently held that the legislature has the power to create strict liability crimes. As Mr. Justice DOUGLAS stated in *Lambert:* "We do not go with Blackstone in saying that a 'vicious will' is necessary to constitute a crime, . . . for conduct alone without regard to the intent of the doer is often sufficient. There is wide latitude in lawmakers to declare an offense and exclude elements of knowledge and diligence from its definition." 355 U.S. at 228, 78 S.Ct. at 242. While wide, however, the legislature's latitude is not unbounded, and legislation creating a strict liability crime must comport with constitutional guarantees. *See Smith v. California,* 361 U.S. 147, 150, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959) (holding unconstitutional an ordinance making it a crime to possess an obscene book without regard to defendant's knowledge of book's contents). *Lambert v. California, supra* (holding unconstitutional an ordinance making it a crime not to register, even though no probability of defendant knowing of duty to register).

The first case where the issue of the constitutionality of a strict liability crime was addressed by the Court was *Shevlin–Carpenter Co. v. Minnesota,* 218 U.S. 57, 30 S.Ct. 663, 54 L.Ed. 930 (1910). There the Court in dictum said that due process was not violated by a state statute that imposed imprisonment for the violation of a strict liability crime. In *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922), and *United States v. Behrman,* 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619 (1922), the Court relied on the dictum in *Shevlin–Carpenter* in concluding that federal narcotics violations punishable by prison terms could be sustained without proof of intent. In so holding in *Balint,* the Court stated that the offense before it was an example of a "regulatory measure[ ] in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of crimes." 258 U.S. at 252, 42 S.Ct. at 302. The Court concluded that in drafting the statute, "Congress weighed the possible injustice of subjecting an innocent seller to a penalty . . . or exposing innocent purchasers to danger from the drug, and concluded that the latter was the result preferably to be avoided." *Id.* at 254, 42 S.Ct. at 303. In *United States v. Dotterweich,* 320 U.S. 277 (1943), 64 S.Ct. 134, 88 L.Ed. 48, the Court, without extended discussion, relied on *Balint* and *Behrman* in concluding that a conviction for violation of a federal law concerning the misbranding of drugs could be sustained without proof of intent. The Court described the crime as an example of "a now familiar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conventional requirement for criminal conduct–awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but

only one case, *Morissette*, has the Court undertaken a full discussion of the problems presented by a statute creating, or arguably creating, a strict liability crime.

In *Morissette* the question before the Court was whether the statute creating the crime of converting government property should be construed to require proof of the defendant's intent to steal. Mr. Justice JACKSON, speaking for the majority, discussed the origins of strict liability crimes and compared strict liability crimes to common law crimes. In the course of this discussion, he explained the Court's earlier decisions in *Balint* and *Behrman*:

> However, the *Balint* and *Behrman* offenses belong to a category of another character, with very different antecedents and origins. The crimes there involved depend on no mental element but consist only of forbidden acts or omissions. This while not expressed by the Court, is made clear from examination of a century-old but accelerating tendency, discernible both here and in England, to call into existence new duties and crimes which disregard any ingredient of intent. The industrial revolution multiplied the number of workmen exposed to injury from increasingly powerful and complex mechanisms, driven by freshly discovered sources of energy, requiring higher precautions by employers. Traffic of velocities, volumes and varieties

standing in a responsible relation to a public danger." 320 U.S. at 280–81, 64 S.Ct. at 136. In *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), the Court concluded that no scienter need be proved to obtain a conviction for a violation of the National Firearms Act. The Court stated that the case was close to *Dotterweich* because it involved "a regulatory measure in the interest of public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act. They are highly dangerous offensive weapons, no less dangerous than the narcotics involved in [*Balint*]." 401 U.S. at 609, 91 S.Ct. at 1118 (footnote omitted). *See also United States v. Park*, 421 U.S. 658, 672, 95 S.Ct. 1903, 1911, 44 L.Ed.2d 489 (1975) (conviction under pure food statute; "[t]he requirements of foresight and vigilance imposed on responsible corporate agents are . . . demanding . . ., but they are *no more stringent* than the public has a right to expect of those who voluntarily assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them.").

unheard of came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. Congestion of cities and crowding of quarters called for health and welfare regulations undreamed of in simpler times. Wide distribution of goods became an instrument of wide distribution of harm when those who dispersed food, drink, drugs, and even securities, did not comply with reasonable standards of quality, integrity, disclosure and care. Such dangers have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare.

342 U.S. at 252–54, 72 S.Ct. at 245 (footnotes omitted). He further explained:

While many of these duties are sanctioned by a more strict civil liability, lawmakers, whether wisely or not, have sought to make such regulations more effective by invoking criminal sanctions to be applied by the familiar technique of criminal prosecutions and convictions. This has confronted the courts with a multitude of prosecutions, based on statutes or administrative regulations, for what have been aptly called "public welfare offenses." These cases do not fit neatly into any of such accepted classifications of common–law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect,

whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime. This has not, however, been without expressions of misgiving.

342 U.S. at 255–57, 72 S.Ct. at 245 (footnotes omitted). After discussing the common law origins of the crime of theft, and concluding that the crime of converting government property had the crime of theft as a direct antecedent, Justice JACKSON concluded that in creating the crime of converting government property, Congress intended to require proof of an intent to steal.

Two important principles may be derived from *Morissette*; it is these principles that render distinctive the analysis to be employed when examining a statute creating, or arguably creating, strict criminal liability. The first principle is that in determining whether the imposition of strict criminal liability is consistent with due process, several factors, including the policy and intent of the legislature, the origins of the offense, the reasonableness of the standards imposed, and the punishment and stigma attached to a conviction, must be considered. The second principle is that in considering these several factors, a court must shuttle back and forth, between the question whether the statute *can* be construed as not requiring proof of criminal intent, and the question whether, *if* so construed, the statute will violate due process; the answer to one of these questions will color,

or affect, the answer to the other. Thus in *Morissette* the Court was persuaded to construe the statute as not creating strict criminal liability but instead as requiring proof of intent.

In *Holdridge v. United States*, 282 F.2d 302 (8th Cir. 1960), Judge, now Mr. Justice, BLACKMUN, after discussing the cases, summarized this process of analysis as follows:

> From these cases emerges the proposition that where a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause.

*Id.* at 310.

Or, to state Justice BLACKMUN's formulation conversely: If the factors discussed in *Morissette* are otherwise–e. g., if the penalty is *not* relatively small, and the conviction *does* gravely besmirch–then the elimination of the element of criminal intent *may* be violative of the due process clause.

Justice BLACKMUN's formulation has been quoted with approval by one other Justice of the Supreme Court, *see United States v. Freed, supra*, 401 U.S. at 613 n. 4, 91 S.Ct. at 1120 (BRENNAN, J., concurring), and has been repeatedly applied by the federal courts. *See United States v. Mowat*, 582 F.2d 1194 (9th Cir. 1978); *United States v. Heller*, 579 F.2d 990 (6th Cir. 1978); *United States v. Erne*, 576 F.2d 212 (9th Cir. 1978); *United States v. Ayo–Gonzalez*, 536 F.2d 652 (5th Cir. 1976); *United States v. Flum*, 518 F.2d 39 (8th Cir. 1975); *United States v. Ray*, 488 F.2d 15 (10th Cir. 1973); *United States v. Margraf*, 483 F.2d 708 (3d Cir. 1973) (*en banc*), *vacated*, 414 U.S. 1106, 94 S.Ct. 833, 38 L.Ed.2d 734 (1973); *United States v. Brown*, 453 F.2d 101

(8th Cir. 1971); *United States v. Corbin Farm Service*, 444 F.Supp. 510 (E.D.Cal.1978) *aff'd*, 578 F.2d 259 (9th Cir. 1978); *United States v. Bowen*, 428 F.Supp. 754 (D.Md.1976). As one would anticipate, the cases have reached varying results, according to whether the *Morissette–Holdridge* factors were or were not present.

Sometimes it has been held that a requirement of intent may not be read into the statute, but that even when so construed, the relevant factors are such that the statute does not violate due process. Thus, in *United States v. Ayo–Gonzalez, supra*, the Fifth Circuit applies the *Morissette–Holdridge* analysis to determine whether the Bartlett Act prohibited unintentional fishing incursions by foreign vessels in United States waters. After an extensive examination of the policy of the Act and its legislative history, the court concluded that no proof of intent was required to sustain a conviction. The court also concluded that this creation of strict criminal liability did not violate due process because the conviction did not invite moral stigma and the maximum sentence of one year imprisonment was not too severe. *See United States v. Mowat, supra* (similar analysis; no proof of intent required for conviction of unauthorized entry onto a military reservation); *United States v. Erne, supra* (no proof of intent required for conviction under section 7215 of the Internal Revenue Code); *United States v. Flum, supra* (extensive analysis; no proof of intent required for conviction of attempting to board an aircraft with a concealed deadly weapon); *United States v. Ray, supra* (Migratory Bird Treaty Act and regulations thereto do not violate due process despite fact that they dispense with element of intent); *United States v. Bowen, supra* (no proof of intent required for conviction under statute prohibiting creation of obstruction to navigable waterways); *see also United States v. Corbin Farm Service, supra*.

Other times it has been held that a requirement of intent may be read into the statute, if the result will be that then the statute will not violate due process. Thus, in *United States v. Heller, supra*, the Sixth Circuit concluded that to

sustain a conviction under a federal statute making it a crime to transmit any demand or request for a ransom the prosecutor was required to prove that the defendant had an intent to extort. The court reached this conclusion after making the analysis prescribed in *Morissette* and *Holdridge*. Especially pertinent to the decision were the legislative history of the statute and the severity of the punishment. *See United States v. Brown*, 453 F.2d 101 (8th Cir. 1971); *see also United States v. Flum, supra* (HEANEY, J., dissenting).

Finally, other times it has been held that a requirement of intent may not be read into a statute, even though the result is that the statute will then violate due process. *See Lambert v. California, supra.* There the Court was precluded from reading in a requirement of intent because the California court had construed the legislation in question--a Los Angeles ordinance--as not including such a requirement. After considering the relevant factors (more fully discussed in *Morissette*), the Court held that the ordinance violated due process.

## B

### *The Pennsylvania Supreme and Superior Court Cases*

In examining statutes creating, or arguably creating, strict criminal liability, our courts have consistently employed the same analysis as was applied in *Holdridge*. Thus, in *Commonwealth v. Koczwara*, 397 Pa. 575, 155 A.2d 825 (1959), which was decided before *Holdridge*, our Supreme Court characterized statutes that do not require proof of criminal intent as "regulatory provisions in fields which are essentially noncriminal . . . generally enforceable by light penalties." *Id.*, 397 Pa. at 580, 155 A.2d at 827. Later, in *Commonwealth v. Bready*, 220 Pa.Super 157, 286 A.2d 654 (1971), this court was required to determine whether a section of the 1959 Vehicle Code making it a crime for a magistrate to fail to make a monthly report created strict criminal liability. Citing *Koczwara* and *Morissette*, we assigned several reasons for our conclusion that the crime was

not a strict liability crime: it was unlike a violation of a regulatory provision; the legislative intent to create strict liability was not clear; the crime was a direct descendent of a common law crime; and the punishment was severe. Similarly, in *Commonwealth v. Black*, 251 Pa.Super. 539, 380 A.2d 911 (1977), this court, again relying on *Koczwara*, concluded that section 3929(a)(2) of the Crimes Code did not create strict criminal liability because the crime was unlike a violation of a public welfare regulatory provision, and the penalties were severe. *See Commonwealth v. Unkrich*, 142 Pa.Super. 591, 16 A.2d 737 (1940).

The analysis set forth in *Holdridge*, therefore, is not to be confined to questions of federal constitutional due process and the interpretation of federal statutes. Rather, it also represents the analysis that will be applied by our own state courts in interpreting a state statute creating, or arguably creating, strict criminal liability.[8] Not only was the analysis applied by this court in *Bready* the same as that applied by Justice BLACKMUN in *Holdridge*, but the factors listed in *Holdridge* as pertinent to determining due process under the federal Constitution are equally pertinent to determining due process under the Pennsylvania Constitution.[9] Thus, our Supreme Court in *Koczwara* ruled that a too severe punishment may be a violation of due process under the Pennsylvania Constitution.

## II

It is now in order to apply the *Morissette–Holdridge–Koczwara–Bready* analysis to the present case. The first step will be to determine whether, in enacting section 3732, the legislature intended to make homicide by vehicle a strict liability crime. If it appears that the legislature did so intend, the second step will be to determine whether the section violates due process. If it appears that it does, the third, and last, step will be to re-examine the section, to

8.  *See* footnote 3 *supra*.

9.  *See* footnote 4 *supra*.

determine whether it may be saved, or whether it must be declared unconstitutional.

### A

*In enacting section 3732, did the Legislature intend to create strict criminal liability?*

The "mere omission from a criminal enactment of any mention of intent should not necessarily be construed as dispensing with it." *Morissette v. United States, supra,* 342 U.S. at 250, 72 S.Ct. at 243. So too, the legislature's use of the word "unintentionally" in section 3732 should not be regarded as by itself sufficient to demonstrate that the legislature intended to remove any and every type of culpability or mens rea as an element of the crime. In order to ascertain the legislature's intent, we must consider the general policy of the legislature toward strict liability crimes, the common law origins and history, if any, of the specific crime at issue–here, homicide by vehicle–and the relevant legislative history. This consideration will disclose an almost even balance between factors for and against the conclusion that the legislature intended strict criminal liability.

### 1

Besides the general principle that penal statutes are to be strictly construed in the defendant's favor, *see* 1 Pa.C.S. § 1928(b)(1); *Commonwealth v. Darush,* 256 Pa.Super. 344, 389 A.2d 1156 (1978), several more specific factors militate against the conclusion that the legislature intended to create strict criminal liability.

First, the legislative policy in this state is against strict criminal liability. In 1972 the legislature enacted the Crimes Code.[10] The Crimes Code was derived from the Model Penal Code and provides that culpability may be found only where the defendant acted either "intentionally,"

10. The Crimes Code, Act of Dec. 6, 1972 P.L. 1482 No. 334, § 1, 18 Pa.C.S. § 101 *et seq.*

312

"knowingly," "recklessly," or "negligently." [11]   The Model Penal Code and the Crimes Code create no strict liability crimes, except for summary offenses.[12]   Indeed, section 2.05

11.  These terms are defined in section 302(b) as follows:

(b) Kinds of culpability defined.–

(1) A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result;  and

(ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist;  and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.  The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

(4) A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct.  The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b).

12.  Even bigamy, long considered a strict liability crime, is not a strict liability crime under the 1972 Crimes Code.  Section 4301 defines bigamy as follows:

(a) Bigamy.–A married person is guilty of bigamy, a misdemeanor of the second degree, if he contracts or purports to contract another marriage, unless at the time of the subsequent marriage:

(1) the actor believes that the prior spouse is dead;

(2) the actor and the prior spouse have been living apart for two consecutive years throughout which the prior spouse was not known by the actor to be alive;  or

of the Model Penal Code "makes a frontal attack on absolute or strict liability," Model Penal Code, Comment to Tentative Draft No. 4 at p. 140, and section 305 of the Crimes Code, which is derived from section 2.05, was described by the Joint State Government Commission as having been enacted "to tone down" absolute or strict liability in penal law as a whole. *See* S. Toll, Pennsylvania Crimes Code Annotated, 86 (1974). Section 305 provides:

**§ 305. Limitations on scope of culpability requirements**

**(a) When culpability requirements are inapplicable to summary offenses and to offenses defined by other statutes.**–The requirements of culpability prescribed by section 301 of this title (relating to requirement of voluntary act) and section 302 of this title (relating to general requirements of culpability) do not apply to:

(1) summary offenses, unless the requirement involved is included in the definition of the offense or the court determines that its application is consistent with effective enforcement of the law defining the offense; or

(2) offenses defined by statutes other than this title, in so far as a legislative purpose to impose absolute liability for such offenses or with respect to any material element thereof plainly appears.

**(b) Effect of absolute liability in reducing grade of offense to summary offense.**–Notwithstanding any other provision of existing law and unless a subsequent statute otherwise provides:

(1) when absolute liability is imposed with respect to any material element of an offense defined by a statute other than this title and a conviction is based upon such liability, the offense constitutes a summary offense; and

(3) a court has entered a judgment purporting to terminate or annul any prior disqualifying marriage, and the actor does not know that judgment to be invalid.

**(b) Other party to bigamous marriage.**–A person is guilty of bigamy if he contracts or purports to contract marriage with another knowing that the other is thereby committing bigamy. 18 Pa.C.S. § 4301.

(2) although absolute liability is imposed by law with respect to one or more of the material elements of an offense defined by a statute other than this title, the culpable commission of the offense may be charged and proved, in which event negligence with respect to such elements constitutes sufficient culpability and the classification of the offense and the sentence that may be imposed therefor upon conviction are determined by section 106 of this title (relating to classes of offenses) and Chapter 11 of this title (relating to authorized disposition of offenders).

18 Pa.C.S. § 305.

The requirement in this section that the intention to create strict (or "absolute") criminal liability must "plainly appear [ ]" manifests a strong legislative policy against strict liability crimes. Consistent with this policy is the provision that when strict criminal liability is created, the crime is no more than a summary offense, unless a "subsequent statute otherwise provides." *See Commonwealth v. Jade East*, 237 Pa. Super. 140, 346 A.2d 542 (1975). In this case, therefore, unless it can be concluded that section 3732 was "plainly" intended to create strict criminal liability, we should interpret the section as including some culpability or mens rea requirement.

Second, a consideration of the history of the term "homicide" also supports the conclusion that the legislature did not intend to create strict criminal liability. Criminal homicides have always required some degree of culpability. Under the Crimes Code, criminal homicide is defined as "intentionally, knowingly, recklessly or negligently caus[ing] the death of another human being," and includes "murder, voluntary . . . [and] involuntary manslaughter." 18 Pa.C.S. § 2501(a) and (b). Thus the legislature's use of the word "homicide," in defining the crime of "homicide by vehicle," supports the conclusion that the legislature intended to require proof of some degree of culpability, for where the legislature "borrows terms of art . . . it presumably knows and adopts the cluster of ideas that were attached to

each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States, supra,* 342 U.S. at 263, 72 S.Ct. at 250.

It must be noted further that included in the "cluster of ideas" attached to criminal homicide is the specific idea of unlawful act or misdemeanor manslaughter. Under section 4703 of the 1939 Penal Code [13] it appeared that a conviction of involuntary manslaughter could be obtained without regard to the defendant's negligence or recklessness if the death resulted from the defendant's unlawful act. *See Commonwealth v. Aurick,* 138 Pa.Super. 180, 10 A.2d 22 (1940), *rev'd,* 342 Pa. 282, 19 A.2d 920 (1941). However, in vehicular manslaughter cases the courts have interpreted the term "unlawful act" as requiring proof that in committing the unlawful act, *e. g.,* violating a traffic ordinance, the defendant acted with recklessness or criminal negligence. *See Commonwealth v. Aurick,* 342 Pa. 282, 19 A.2d 920 (1941), *rev'g,* 138 Pa.Super. 180, 10 A.2d 22 (1940); *Commonwealth v. Clowser, supra.* Thus, in *Clowser,* Judge HOFFMAN, after discussing a number of authorities from this and other jurisdictions, concluded that "the unlawful act, that is, the infraction, must be done in such a manner as to more than constitute a mere thoughtless omission or slight deviation from the norm of prudent conduct. . . . Were we to hold otherwise, the Commonwealth might obtain a conviction for manslaughter based upon a violation of a regulatory statute, where the conduct involved might not support a civil suit." *Id.* 212 Pa.Super. at 213–14, 239 A.2d at 873 (citation omitted). Under the Crimes Code, "a person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner . . . , he causes the death of another person."

**13.** Section 4703 of the 1939 Penal Code provided:

Whoever is convicted of involuntary manslaughter, happening in consequence of an unlawful act, or the doing of a lawful act in an unlawful way, is guilty of a misdemeanor, and shall be sentenced to pay a fine not exceeding two thousand dollars ($2,000), or to undergo imprisonment not exceeding three (3) years, or both. 18 P.S. § 4703.

18 Pa.C.S. § 2504. Thus, under both the cases and the Crimes Code, there can be no unlawful act manslaughter without a showing of recklessness or gross negligence. This fact supports the conclusion that the legislature did not intend to create a new type of unlawful act homicide that would require no proof of recklessness or negligence.

Third, and finally, one aspect of legislative history also supports the conclusion that the legislature did not intend to create strict criminal liability. In enacting The Vehicle Code of 1976, of which section 3732 is a part, the legislature decided not to create the crime of careless driving. Under House Bill No. 1817 there was a proposal to retain the crime of reckless driving and to create a new crime of careless driving. After extensive debate, however, the careless driving section was defeated.[14] In support of removing the careless driving section from the Bill, Representative Eckensberger stated:

> Now may I respectfully submit to the members of this House that we do not need to create a new crime identified as careless driving. It shocks my conscience that we should say that it henceforth will be a crime if you drive carelessly. Now that amounts to ordinary negligence. Can you imagine the number of cases that would flow through a magistrate's office if we were to identify ordinary negligence as a crime? It would proliferate the number of cases, clog up the courts unnecessarily. We are doing well now without it.
>
> .　　.　　.　　.　　.
>
> Mr. Bonetto suggests that careless drivers should not be on the highway. I suggest to you that at some point in time every one of us has been careless in the manner of operating a vehicle–not intentionally so, depending, of course, on how you interpret the word "careless"–and that he and the rest of us would probably not be on the highway, as well as the rest of the general public, if we

14. Indeed, the amendment to remove the section creating the crime of careless driving from the House Bill went through three separate votes.

are going to say that every careless act should be a crime. I am not advocating that carelessness should not be accounted for. We have the civil courts that take care of the careless operation of vehicles.

Legislative Journal–House, at pp. 4072–73 (1976).

Later, when the matter was being considered for the third time Representative Eckensberger stated:

Very briefly, the amendment would seek to delete a new crime, being that of careless driving. I believe that we should remove this section in House bill No. 1817 because we will retain the concept of reckless driving as an offense; there will still be civil liabilities attached to careless driving. To subject our citizens to being arrested for committing what I consider to be ordinary negligence would be unfair to our citizenry in the Commonwealth who operate their motor vehicles in good faith.

I find no need for the section. I hope that all of the members do recall the debate of yesterday. I am not going to try to go into all of those things now, but merely hope that all the members will support this amendment.

*Id.* at p. 4160.

In support of Representative Eckensberger's amendment, Representative Manderino, stated:

Mr. Speaker, very briefly, I think some of the points that I intended to make were made by Mr. Hutchinson. I think Mr. Eckensberger's and Mr. Hutchinson's point of view is entirely correct. I see no reason to introduce into the statutes of Pennsylvania a new concept in the violation of the Motor Vehicle Code wherein ordinary negligence, carelessness, can be the reason for a citation.

For every accident that would occur, there would be a criminal citation. I think that we should not do that. I think that Mr. Eckensberger, upon reflection of yesterday's vote, and many others have realized this, and I would ask for a vote sustaining the position of Mr. Eckensberger and pulling out the designation of careless driver as a violation of the Vehicle Code.

*Id.*

Representative Scirica stated:

> Mr. Speaker, I cannot think of any other area in the law where ordinary negligence carries with it a criminal penalty. We should leave this as a civil matter and I think it is important that we support Mr. Eckensberger's amendment.

*Id.* at p. 4161.

After this third debate on the House floor, the House voted to remove the careless driving section from the Bill.

This history manifests a desire on the part of the legislature not to make citizens subject to criminal sanctions for mere carelessness. Accordingly, it provides a strong argument that the legislature would also not intend to subject appellee to a misdemeanor charge for what was, at most, mere carelessness.[15]

### 2

Despite the foregoing considerations, I have concluded that in creating the crime of homicide by vehicle, the legislature did intend to create strict criminal liability. My principal reason for this conclusion is the history of section 3732.

There appears to have been no debate in the House or Senate specifically concerned with section 3732. That section, however, has a history of its own, which is relevant to the issue before us. It was derived from section 11–903(a) of the Uniform Vehicle Code, which provides:

> (a) Whoever shall unlawfully and unintentionally cause the death of another person while engaged in the violation of any state law or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic shall be guilty of homicide when such violation is the proximate cause of said death.

Uniform Vehicle Code § 11–903(a).

---

15. In sustaining appellee's demurrer, the lower court relied on the legislative history of the careless driving section to conclude that the legislature did not intend to create criminal liability without proof of recklessness or gross negligence.

Accordingly, included in the "cluster of ideas" attached to section 3732 is the development and interpretation of section 11–903(a) of the Uniform Vehicle Code. *See* 1 Pa.C.S. § 1927.

Until 1962, the Uniform Vehicle Code described the crime created by section 11–903(a) as "negligent homicide"; and the section read as follows:

(a) When the death of any person ensues within 1 year as a proximate result of injury received by the driving of any vehicle in reckless disregard of the safety of others, the person so operating such vehicle shall be guilty of negligent homicide.

Uniform Vehicle Code section 11–903(a) (1956 version). In 1962, however, the present version was adopted. When the 1956 version ("reckless disregard") is compared with the present version ("violation of any state law or municipal ordinance"), it is clear that the drafters of the Uniform Vehicle Code intended to change the character of the crime, and to make it into a strict liability crime, requiring proof of no more than a mere violation of any traffic ordinance that resulted in the death of another. *See* Commentary, *Homicide by Vehicle* 1 (1978).

Many states have enacted statutes similar to section 11–903(a). Most of these states, however, have either added or retained some requirement that the defendant act negligently or recklessly. *See* National Committee on Uniform Traffic Law Ordinances, Traffic Laws Annotated, § 11–903 (1972). North Carolina enacted section 11–903(a) without any significant alterations, and it has been interpreted in that state as requiring no proof of criminal intent. *State v. Freeman*, 31 N.C.App. 93, 228 S.E.2d 516 (1976). When the same thing happened in Ohio, *State v. Kotapish*, 171 Ohio St. 349, 171 N.E.2d 505 (1960), the Ohio legislature repealed the statute and enacted a new statute that required proof of recklessness or negligence. *See* Traffic Laws Annotated, *supra.*

We must assume, I believe, that when the Pennsylvania legislature enacted section 3732, it was aware of the history

of that section in Ohio and the other states that added or retained some requirement that the defendant act negligently or recklessly. Yet, although it very easily could have done so, the legislature did not add any requirement of negligence or recklessness to the section, nor did it enact the 1956 version of section 11–903(a) of the Uniform Vehicle Code. Thereby the legislature indicated its intent to adopt the 1962 revision, requiring proof of no more than a traffic violation causing death.

It is true that section 3732 was only one section among many that were included in the massive piece of legislation passed as The Vehicle Code of 1976. This fact, plus the fact that there was no legislative debate concerning section 3732, might suggest that the section simply slipped through the legislature without being noticed, and that if it had been noticed, the legislature would not have created strict criminal liability, just as it did not create the crime of careless driving. This suggestion, however, cannot be accepted, for section 3732 did not slip through unchanged. In the course of enacting it, the legislature removed the words "unlawfully" and "proximate" from section 11–903(a) of the Uniform Vehicle Code, and added the phrase, "a misdemeanor of the first degree."

In addition to this history, it is important to note that if the legislature had intended to limit criminal violations under section 3732 to reckless or negligent defendants, it need not have enacted the section at all, for those defendants were already subject to prosecution for involuntary manslaughter under section 2504 of the Crimes Code. See 18 Pa.C.S. § 2504. Indeed, a consideration of the crime of involuntary manslaughter provides what seems to me a probably correct explanation of why the legislature intended to create strict criminal liability under section 3732. The cases demonstrate that the Commonwealth has had difficulty in obtaining convictions for involuntary manslaughter, for proof of a traffic violation may not be proof of recklessness or gross negligence. See *Commonwealth v. Trainor*, 252 Pa.Super. 332, 381 A.2d 944 (1977); *Commonwealth v. Greer*,

*supra; Commonwealth v. Clowser, supra.* It seems probable that in enacting section 3732, the legislature intended to overcome this difficulty by broadening the scope of liability to include those persons who merely violated traffic ordinances.[16] The North Carolina court in *State v. Freeman, supra,* attributed just such an intent to the North Carolina legislature. Said the court:

> The number of deaths resulting from the operation of motor vehicles on the highways has increased to an alarming extent. Indictment for the common law crime of manslaughter has proved ineffective as a means of repressing the negligence in motor vehicle operation causing death upon the public thoroughfares. The motorist is generally a reputable citizen, and the wrong committed by him which brings someone to his death is most often an unintentional violation of a prohibitory statute or ordinance, unaccompanied by recklessness or possible consequences of a dangerous nature, when tested by the rule of reasonable prevision. Thus it is apparent that the intention of the legislature in enacting [homicide by vehicle] was to define a crime of lesser degree of manslaughter wherein criminal responsibility for death by vehicle is not dependent upon the presence of culpable or criminal negligence.

31 N.C.App. at 97, 228 S.E.2d at 519.

I recognize, and have earlier in this opinion emphasized, that the intent to impose strict criminal liability must "plainly appear[ ]." Here, however, I have concluded that the intent does plainly appear; that conclusion, it seems to me, is required by the history of section 11–903(a) as the model for section 3732, and by a recognition of the legislature's probable purpose to broaden liability beyond that

**16.** In *Trainor*, Judge, now President Judge, CERCONE, after stating the principle that "not every violation of a law or unlawful act in the operation of a motor vehicle will render an operator *criminally* liable for deaths which may result." *Id.,* 252 Pa.Super. at 337, 381 A.2d at 947 (emphasis in original), added in a footnote that "the vitality of this principle is cast in doubt as a result of the recently enacted Vehicle Code." *Id.,* 252 Pa.Super. at n. 4, 381 A.2d at n. 4. He then quoted section 3732.

contained in the involuntary manslaughter provision of the Crimes Code. No doubt what seems plain to one person may not seem so plain to another. As I remarked at the beginning of this opinion, I regard the issue of what the legislature intended as exceedingly close; for given the strength of the policy against strict criminal liability, as expressed in the Crimes Code, and the legislature's unwillingness to make careless driving a crime, as reflected in its debates, it is certainly arguable that whatever the legislature's intention in enacting section 3732, it is not an intention that "plainly appears." I can only respond that for me, it appears plainly enough.

It has been argued that as a matter of policy, it would be most unwise to impose strict criminal liability for conduct such as appellee's. I entirely agree;[17] but I may not permit my opinion on a matter of policy to affect my decision here, for so long as the legislature acts lawfully, it is entitled to decide matters of policy. *See Lurie v. Republican Alliance,* 412 Pa. 61, 65, 192 A.2d 367, 370 (1963), *quoting Commonwealth ex rel. Fox v. Swing,* 409 Pa. 241, 186 A.2d 24 (1962).

17. In my opinion, to make a "reputable citizen," to quote the North Carolina court in *Freeman,* a criminal merely because of a single careless act causing a death is an improper use of the criminal sanction. First of all, an action otherwise not criminal should not become criminal merely because of the result. "[I]f criminality of conduct is to turn on the result, it rests upon fortuitous considerations unrelated to the major purpose to be served by the declaration that behaviour is a crime." Wechsler, The Challenge of a Model Penal Code, 65 Harv.L.Rev. 1097, 1106 (1952). Second, it is at best doubtful that making criminals out of reputable citizens like Theresa Barone will in any way serve the purpose of reducing the carnage on the highways. Of *course* the carnage should be reduced, and there are many ways in which it might be; but enacting section 3732 is not one of those ways. T. Brian Hogan's comment seems apposite:

The assumption seems to be that we have done something about a problem if we make a crime of it, and clearly this is an illusion that legislators would like us all to share. They can satisfy their customers by telling them that something which they disapproved has now been made a crime as though that was that. No customer is ever bold enough to ask whether making a crime of it will make it disappear. The legislator is thus spared the exacting task of devising a policy that might be effective to cure the evil.

Hogan, Crime, Punishment and Responsibility, Giannella Memorial Lecture, April 5, 1979, reprinted in 24 Vill.L.Rev. 690, 693 (1979).

Our duty, as a court, is not to examine the wisdom of the legislature's decisions, as reflected in its enactment, but to determine and then enforce the meaning of that enactment. *See* 1 Pa.C.S. § 1921(a).

## B

*When construed to create strict criminal liability, does section 3732 violate due process?*

In testing the constitutionality of a statute creating strict criminal liability, the two most important considerations are the severity of the possible punishment and the moral stigma that may be attached to a conviction. As the Sixth Circuit stated in *United States v. Heller, supra*, "Certainly if Congress attempted to define a [strict liability] offense that placed an onerous stigma on an offender's reputation and that carried a severe penalty, the Constitution would be offended." 579 F.2d at 994. *And see Morissette v. United States, supra*, (strict criminal liability may be upheld where "penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation"); *Holdridge v. United States, supra* ("where the penalty is relatively small; where conviction does not gravely besmirch").

## 1

Appellee's conviction under section 3732 of homicide by vehicle places a most onerous stigma on her reputation.

The Commentary, *Homicide by Vehicle, supra*, states that the use of the term "homicide by vehicle," as compared with the term "manslaughter," "lessen[s] the stigma attached to convictions." *Id.* at 13. If this be so, the stigma attached nevertheless remains most onerous. As Henry Hart has observed, one cannot truthfully say to any defendant that there is nothing wrong with being labeled a criminal. Hart, *The Aims of the Criminal Law*, 23 Law & Contemp. Prob. 401, 423 n. 57 (1958). Especially is this so when the crime is "homicide by vehicle." Labels may not be ignored. To be labeled a rapist or murderer places a far more onerous stigma on a person than to be labeled as someone convicted

of misbranding a drug. *See United States v. Dotterweich, supra.* While the word "homicide", by itself, means only the killing of a human being, included within this definition are the terms "murder" and "manslaughter." Indeed, the Crimes Code defines the term "criminal homicide" so as to include "murder" and "manslaughter." *See* 18 Pa.C.S. § 2501(b). Adding the phrase "by vehicle" does little to lessen the stigma attached to the word "homicide," except perhaps among lawyers. In popular parlance, "homicide" is usually equated with "murder." Thus a common example of the use of the term "homicide" is to describe "a squad of detectives that specializes in solving murders (the boys in will get all the details—Thurston Scott)". Webster's Third International Dictionary, (1965).

While there apparently has been no case holding what type of a conviction does such grave damage to reputation as to violate the federal due process clause, it must be noted that the stigma attached to "homicide by vehicle" is different from, and far more serious than, the stigma attached to such crimes as the fishing violation considered in *United States v. Ayo–Gonzalez, supra,* or the trespass violation considered in *Holdridge.* This court has been extremely concerned with the unfair effects that a criminal record may have upon a defendant's future. *See Commonwealth v. Iacino,* 270 Pa.Super. 350, 411 A.2d 754 (1979) (expunction of criminal record); *Commonwealth v. Malone,* 244 Pa.Super. 62, 366 A.2d 584 (1976) (same).[18] Indeed, it is not an over-

18. In *Malone,* Judge HOFFMAN described the effects of an arrest record on the future of the accused. He stated:

The harm ancillary to an arrest record is obvious: "Information denominated a record of arrest, if it becomes known, may subject an individual to serious difficulties. Even if no direct economic loss is involved, the injury to an individual's reputation may be substantial. Economic losses themselves may be both direct and serious. Opportunities for schooling, employment, or professional licenses may be restricted or nonexistent as a consequence of the mere fact of an arrest, even if followed by acquittal or complete exoneration of the charges involved. An arrest record may be used by the police in determining whether subsequently to arrest the individual concerned, or whether to exercise their discretion to bring formal charges against an individual already arrested. Ar-

statement to say that to saddle appellee in this case with a homicide record might result in more damage to her future than even the imprisonment she may receive for her conviction.

## 2

The remaining question is whether section 3732 carries a penalty that is "severe," *United States v. Heller, supra,* or "relatively small," *Morissette v. United States, supra; Holdridge v. United States, supra.* The penalty under section 3732 may be imprisonment for a maximum term of five years.

Most commentators agree that *no* sentence of imprisonment is *ever* proper in a strict criminal liability case. The basis for this conclusion is that strict liability crimes, or what have been termed public welfare offenses, are distinct from true crimes, or infamous crimes, which involve moral culpability. Thus Mr. Justice BRANDEIS has stated that it is "the imprisonment in a penitentiary which now renders a crime infamous." *United States v. Moreland,* 258 U.S. 433, 477–78, 42 S.Ct. 368, 373, 66 L.Ed. 700 (1921) (BRANDEIS, J., dissenting, joined by TAFT, C. J., and HOLMES, J.). *See* J. FEINBERG, DOING AND DESERVING, 111–13 (1970). The Official Comment to the Model Penal Code states that strict liability crimes "are indefensible in principle, unless reduced to terms that insulate conviction from the type of moral condemnation that is and ought to be implicit when a sentence of imprisonment may be imposed." Model Penal Code, Comment to Tentative Draft No. 4 at 140.[19] Herbert

rest records have been used in deciding whether to allow a defendant to present his story without impeachment by prior convictions, and as a basis for denying release prior to trial or an appeal; or they may be considered by a judge in determining the sentence to be given a convicted offender."
244 Pa.Super. at 68–69, 366 A.2d at 587, *quoting Menard v. Mitchell,* 430 F.2d 486, 490–91 (D.C.Cir.1970).

**19.** The Comment continues:
It has been argued, and the argument undoubtedly will be repeated, that absolute liability is necessary for enforcement in a number of the areas where it obtains. But if practical enforcement can not undertake to litigate the culpability of alleged deviation

Wechsler, the Official Reporter to the Model Penal Code, has stated that strict criminal liability should not be imposed "where any major sanction is involved. In such a case, if not always, absolute penal liability is an abuse." Wechsler, *The Challenge of a Model Penal Code,* 65 Harv.L.Rev. 1097, 1109 (1952). Francis Sayre, one of the first, and most noted, commentators in the area, stated that the reason the defendant's intent need not be probed in strict liability crimes is that "the penalty in such cases is so slight that the courts can afford to disregard the individual in protecting the societal interest." Sayre, *Public Welfare Offenses,* 33 Col.L. Rev. 55, 69–70 (1933). He went on to state:

> If [the punishment] be serious, particularly if the offense be punishable by imprisonment, the individual interest of the defendant weighs too heavily to allow conviction without proof of guilty mind. To subject defendants entirely free from moral blameworthiness to the possibility of prison sentences is revolting to the community sense of justice; and no law which violates this fundamental instinct can long endure.

> *Id.* at 72.

Similarly, Herbert Packer has stated:

> The relevant distinctions may perhaps be found in the consequences of a 'criminal conviction.' While we have few clues about the indirect consequences of a judgment formally denominated 'criminal' with respect to relatively minor infractions, the direct consequence is easily assessable. The combination of stigma and loss of liberty involved in a conditional or absolute sentence of imprisonment sets that sanction apart from anything else the law imposes. Here at the very least the line should be drawn. No one should be sentenced to imprisonment or its equiva-

from legal requirements, we do not see how the enforcers rightly can demand the use of penal sanctions for the purpose. Crime does and should mean condemnation and no court should have to pass that judgment unless it can declare that the defendant's act was wrong. This is too fundamental to be compromised. The law goes far enough if it permits the imposition of a monetary penalty in cases where strict liability has been imposed.

lent without being afforded the opportunity to litigate the issue of mens rea . . . .

Packer, *Mens Rea and the Supreme Court*,[20] 1962 Sup.Ct. Rev. 107, 150.

*See Zweibon v. Mitchell*, 516 F.2d 594, 679 n. 13 (D.C. Cir. 1975) (BAZELON, J., concurring and dissenting) (distinguishes judicial concern where the sanction for strict liability is loss of property as opposed to physical incarceration); *People ex rel. Price v. Sheffield Farms Co.*, 225 N.Y. 25, 32–33, 121 N.E. 474, 477 (1918) (CARDOZO, J.) (strict liability may be proper for petty offense but reserves judgment on propriety of imprisonment for strict and vicarious liability crimes).[21]

Given the fact that strict liability crimes involve no moral culpability, imprisonment for their commission can serve no proper penal purpose. Thus the National Commission on Reform of Federal Criminal Laws states in Volume 1 of its Working Papers:

> The justification for imposing criminal liability where there is no fault has been that enforcement of society's demands requires it. * * * If a person's conduct has

**20.** Packer distinguishes strict tort liability from strict criminal liability because of their different effects. Thus, he says that "[b]ut the transfer of money from one pocket to another is one thing, and the judgment of community condemnation expressed in a criminal conviction is quite another. So long as that sanction is resorted to, moral blameworthiness should be the indispensible condition precedent to its application." 1962 Sup.Ct.Rev. at 148

**21.** In discussing strict liability in *Watson Seafood and Poultry Co. v. Thomas*, 289 N.C. 7, 220 S.E.2d 536 (1975), the Supreme Court of North Carolina stated:

> The bases for the inclusion of violations of motor vehicle and traffic laws within the scope of [the above] rule are *[sic]* that (1) the requirement of proving intent or guilty knowledge would make it impossible to enforce such laws in view of the tremendous numbers of petty offenses growing out of the host of motor vehicles upon our roads and (2) the punishments for such violations are usually a small fine. *We would not extend the rationale of this rule beyond petty offenses involving light punishment nor would we extend its operation to any crime involving moral delinquency.*

Id. at 14, 220 S.E.2d at 541–42 (emphasis added).

been truly without fault, however, the threat of punishment will not favorably affect his conduct. The imposition of punishment is not needed to "reform" or "rehabilitate" him; no fault requiring correction has been identified. Punishment, if it takes the form of detention, will prevent him from engaging in the conduct while he is detained. It may also satisfy the community's (irrational) demand for retribution for the harm which the conduct caused.

These slight functions which can be served are manifestly inadequate justifications for criminal liability without fault. Preventive detention of the kind involved here has no place in the criminal law. It is unlikely that the community will feel strongly about offenses of this kind (although it may strongly support regulation of the activity involved), particularly when there is no culpability, and unlikelier still that, if the community has such feelings, they will be so strong that they should be recognized for the sake of the community, despite their irrationality. Working Papers, *supra* at 129

Accordingly, the imposition of a prison sentence for a strict liability crime has been condemned by the Commission and by the legal commentators as "irrational," [22] and "incompatible with the basic requirements of our Anglo–American, and indeed, any civilized jurisprudence," Wasserstrom, *Strict Liability in the Criminal Law*, 12 Stan.L.Rev. 730 (1960).[23]

I acknowledge that despite the foregoing scholarly commentary, the federal courts have held that a sentence of imprisonment may be imposed for conviction of a strict liability crime. *United States v. Balint, supra* (five years); [24]

**22.** Indeed, Herbert Packer has stated that "[s]trict liability in the criminal law is irrational, in the substantive due process sense of that word." 1962 Sup.Ct.Rev. at 152.

**23.** *See* J. Hall, Principles of Criminal Law, 279–322; G. Williams, Criminal Law, §§ 70–76; Mueller, On Common Law Mens' Rea, 42 Minn.L.Rev. 1043 (1958).

**24.** In *Morissette*, Justice JACKSON referred to Judge CARDOZO's opinions in *People ex rel. Price v. Sheffield Farms Co., supra*, and

*United States v. Freed, supra* (ten years); *United States v. Mowat, supra* (six months imprisonment); *United States v. Ayo–Gonzalez, supra* (one year imprisonment). *But see United States v. Heller, supra* (possible twenty year term is too severe for a strict liability crime). It is because of these cases that I said at the beginning of this opinion that "perhaps" section 3732 did not violate federal due process. It very well may violate federal due process, for *in addition* to carrying a sentence of imprisonment, conviction "gravely besmirch[es]" the defendant's reputation. *United States v. Holdridge, supra.* However, I know of no federal case resting a finding of violation of due process on damage to reputation alone.

How the federal courts would decide such a case need not concern us, for under the decisions of our Supreme Court and of this court, it is settled that imposition of imprisonment upon conviction of a strict liability crime does constitute a violation of due process under our State constitution.

In *Commonwealth v. Koczwara, supra,* the defendant was convicted of violating the Pennsylvania Liquor Code by serving alcohol to minors. The evidence established that an employee of the defendant served the minors when the defendant was not present and without the defendant's knowledge. Nevertheless the defendant was convicted, fined, and sentenced to three months imprisonment. On appeal the Supreme Court noted that the crime was a violation of a mere "regulatory provision," " generally enforceable by light penalties, and although violations are labelled crimes, the considerations applicable to them are totally different from those applicable to true crimes, which involve moral delinquency and which are punishable by imprisonment or another serious penalty." 397 Pa. at 580,

*Tenement House Department v. McDevitt,* 215 N.Y. 160, 109 N.E. 88 (1915), and discussed the distinction between crimes carrying petty penalties and crimes carrying severe penalties. He also included the severity of the punishment as part of the constitutional and statutory construction test for strict liability offenses. Despite this, however, he did not overrule *Balint.*

155 A.2d at 827. Although concluding that the legislature could create such strict criminal liability,[25] the Court held that to imprison the defendant violated due process under the Pennsylvania Constitution. In so holding the Court stated:

> The Courts of the Commonwealth have already strained to permit the legislature to carry over the civil doctrine of *respondeat superior* and to apply it as a means of enforcing the regulatory scheme that covers the liquor trade. We have done so on the theory that the Code established petty misdemeanors involving only light monetary fines. It would be unthinkable to impose vicarious criminal responsibility in cases involving *true crimes*. Although to hold a principal criminally liable might possibly be an effective means of enforcing law and order, it would do violence to our more sophisticated modern–day concepts of justice. *Liability for all true crimes, wherein an offense*

**25.** In reaching this conclusion, the Court cited Sayre's article, Criminal Responsibility for the Acts of Another, 43 Harv.L.Rev. 689 (1930). In that article Professor Sayre made the same distinction between true crimes, with true punishments, and regulatory crimes, with light punishments, as he later made with respect to strict liability offenses in his article, Public Welfare Offenses, *supra*. In discussing vicarious liability, Sayre said:

> To hold the master liable if he fails to prevent his servant from committing the prohibited conduct will have a powerful deterrent effect. On the other hand, to require from the state actual and positive proof of specific authorization or actual knowledge and acquiescence in a matter lying peculiarly within the secret knowledge of the two concerned in the offense, will effectually block most convictions and open the way for successful evasion through secret instructions and covert understandings. The protection of important social interests may thus be sacrificed to a too–zealous concern for individual interests of only trifling importance. Since in such cases deterrence is the essential objective, the present tendency of the law to hold the master criminally liable even for the unauthorized and unknown acts of his servant seems justified, and indicates a direction of sound growth. As long as courts are careful not to permit *respondeat superior* to creep into the true crime cases, masters and principals should be held criminally liable for the petty misdemeanors of their servants and agents which involve no moral delinquency or severe punishment and which are committed in the course of the master's business.

43 Harv.L.Rev. at 722. *See Commonwealth v. Wolfe*, 433 Pa. 141, 143, 249 A.2d 316, 317 (1969).

*carries with it a jail sentence, must be based exclusively upon personal causation.*

*Id.,* 397 Pa. at 585, 155 A.2d at 830 (emphasis added).

While *Koczwara* involved vicarious liability, it is nevertheless controlling on the issue presented in this case because of the distinction made by the Court between, on the one hand, true crimes, and on the other hand, strict liability (including vicarious liability) crimes. The Court made it clear that to imprison someone for anything other than a true crime was unconstitutional; and it defined a true crime as one that involves *both* "moral delinquency" and "personal causation." From this distinction the conclusion followed that since strict liability (including vicarious liability) crimes are not true crimes, they may not constitutionally be punished by imprisonment. Thus in *Koczwara* our Supreme Court went beyond *Balint,* and the federal cases following it, and gave judicial recognition to the views of Sayre[26] and the other commentators, that since strict liability crimes are not true crimes they should not be punished like true crimes.[27]

This principle has been applied by this court in cases arising after *Koczwara.* For instance, in *Commonwealth v. Bready, supra,* this court cited *Koczwara,* stated that a punishment of 60 days imprisonment was too harsh, and therefore interpreted the statute in question as one that did not impose strict liability. Similarly, in *Commonwealth v. Black, supra,* in deciding whether the statute in question imposed strict liability, this court again cited *Koczwara,* and held that prison terms of two to five years were "too heavy" to permit the statute to be construed as one imposing strict liability. *And see Government of Virgin Islands v. Rodri-*

**26.** *See* footnote 24 *supra.*

**27.** The Court did not go as far as some of the commentators who decry any criminal sanction for strict liability. *See* Rappard, The Mistake of Law as a Defense, 36 Temp.L.Q. 261, 286–87 (1963). The Court did, however, state that it sympathized with such pleas for a return to "the moral implications of criminal guilt," but added that it would await further determinations by the United States Supreme Court as to whether the decision in *Lambert* would be extended. 397 Pa. at 584 n. 6, 155 A.2d at 830 n. 6.

*quez*, 423 F.2d 9, 13 n. 12 (3d Cir. 1970) (discussing strict liability; *Koczwara* represents a "restriction of the doctrine to public welfare offenses punishable by fines rather than by imprisonment.")

## C

### *Is it possible to save section 3732?*

Since, when construed to create strict criminal liability, section 3732 violates due process, both because conviction too gravely besmirches the defendant's reputation and because the punishment is too severe, it is necessary to proceed to the third, and final, step of the *Morissette—Holdridge* analysis, and re–examine the section to determine whether after all it may be construed so that it will not violate due process. Two possible constructions suggest themselves.

### 1

The first possible construction would be to construe section 3732 as not imposing strict criminal liability. That is what the Sixth Circuit did in *United States v. Heller, supra*, and this court, in *Commonwealth v. Bready, supra*, and *Commonwealth v. Black, supra* ; it would not be an unworthy result here, given the force of the factors previously discussed in part II of this opinion as favoring the conclusion that strict liability was not intended. Nevertheless, the difficulty, which I find insuperable, would be that then we should have to answer the question, If section 3732 does not create strict criminal liability, what sort of conduct does it make culpable? By its own terms section 3732 does not refer to intentional conduct. The only remaining forms of culpable conduct would seem to be either recklessness or negligence. However, if section 3732 is construed to require proof of either of these, it becomes a duplicate of section 2504 of the Crimes Code, which defines involuntary manslaughter as a crime:

> **(a) General rule.**—A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or

the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

18 Pa.C.S. § 2504.[28]

It would be to some extent absurd to have two different criminal statutes apply to the same conduct.[29]  Apart from the possibility that problems would probably be created by the "more specific offense" doctrine, *see Commonwealth v. Brown*, 269 Pa.Super. 150, 409 A.2d 108 (1979), it seems clear, as already discussed, that in enacting section 3732, the legislature intended to avoid the difficulties of proof encountered in involuntary manslaughter cases, that is, intended that homicide by vehicle should *not* duplicate but should be easier to prove than involuntary manslaughter.

### 2

The second possible construction would be to construe section 3732 as creating strict criminal liability, but to save it by removing that part or parts that result in a violation of due process.  That is what the Supreme Court did in *Commonwealth v. Koczwara, supra*, where instead of striking down the section of the Liquor Code involved, the Court merely removed from the section the sanction of imprisonment.  To save section 3732, however, one would have to remove from it not only the sanction of imprisonment but also the label "homicide by vehicle"; for as discussed above, what renders the section a violation of due process is the

---

28.  "[G]rossly negligent manner" means criminal negligence, which is defined in 18 Pa.C.S. § 302(b)(4) as conduct that "involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation."  Thus, "grossly" differentiates gross negligence from simple or civil negligence; it does not indicate that some standard of negligence higher than criminal negligence is required.  *Commonwealth v. Garcia*, 474 Pa. 449, 378 A.2d 1199 (1977); *Commonwealth v. Polimeni*, 474 Pa. 430, 378 A.2d 1189 (1977); *Commonwealth v. Trainor, supra.*

29.  Since "grossly negligent manner" means criminal negligence as defined in section 302(b)(4), to interpret section 3732 to apply to negligent homicides, as the President Judge does, would render that section a duplicate of the involuntary manslaughter statute which covers both recklessness and criminal negligence.  *See* footnote 27 *supra.*

combination of a too severe penalty and a too onerous stigma. Removing both the sanction of imprisonment and creating a new name for the crime would amount to rewriting the section and would be an encroachment upon the legislative function.

### 3

I am thus left with the conclusion that rather than attempt to save section 3732, it should be declared unconstitutional. The legislature would then be free to produce a constitutional version of the section, if it should so desire.

I should affirm the decision of the lower court.[30]

HOFFMAN, J., joins in this concurring opinion.

WIEAND, Judge, dissenting:

I respectfully dissent.

On September 14, 1977, at or about 8:00 o'clock, A.M., Theresa Barone was operating a motor vehicle northwardly on Bethel Grant Road in Upper Gwynedd Township, Montgomery County. When she came to the intersection of Bethel Grant Road and Morris Road, she stopped as she was commanded to do by a stop sign. Because traffic was heavy, she waited several minutes for traffic to pass. When she believed the roadway to be clear of traffic, she started through the intersection. While still in the intersection, her vehicle was struck on the side by a motorcycle which she did not see prior to impact. The driver of the motorcycle died from injuries received in the collision. Ms. Barone was charged with homicide by vehicle for failing to yield the right of way to the motorcycle on the through street as required by 75 Pa.C.S. § 3323(b).[1] At trial the Common-

---

**30.** I should also overrule *Commonwealth v. Danchision*, 270 Pa.Super. 112, 410 A.2d 1274 (1979), where a panel of this court decided the issue presented here.

**1.** This section provides, inter alia: "After having stopped, the driver shall yield the right–of–way to any pedestrian in a crosswalk or to any vehicle in the intersection or approaching on another roadway so closely as to constitute a hazard during the time when the driver is moving across or within the intersection or junction of roadways."

wealth presented the foregoing facts and rested. The trial court sustained a demurrer to the Commonwealth's evidence, and the Commonwealth appealed.[2]

Homicide by vehicle is defined in Section 3732 of the Vehicle Code, 75 Pa.C.S. § 3732, which provides:

> "Any person who unintentionally causes the death of another person while engaged in the violation of any law of this Commonwealth or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic is guilty of homicide by vehicle, a misdemeanor of the first degree, when the violation is the cause of death."

The offense, thus defined, includes three express elements: (1) a violation of a law or ordinance relating to the operation of motor vehicles; (2) the death of another person; and (3) a causal connection between the violation and the death. Proof of further culpability is not mandated by the statute. Specifically, the statutory language does not require conduct which is reckless or grossly negligent. In this respect it is distinct from the crime of involuntary manslaughter which, by definition, requires the doing of an act in a 'reckless or grossly negligent manner." 18 Pa.C.S. § 2504.[3]

The legislature may define a crime so that proof of criminal intent is not necessary. *Commonwealth v. Black*, 251 Pa.Super. 539, 542, 380 A.2d 911, 913 (1977); *Commonwealth v. Grant*, 235 Pa.Super. 357, 364–65, 341 A.2d 511, 515 (1975). Whether criminal intent is a necessary ingredient of a statutory offense is a matter of construction, to be determined from the language of the statute and from its manifest purpose and design. *Commonwealth v. Koczwara*, 397

---

**2.** Theresa Barone filed a cross appeal from a pre–trial order denying her motion to have Section 3732 of the Pennsylvania Vehicle Code, 75 Pa.C.S. § 3732, declared unconstitutional.

**3.** Prior to the enactment of homicide by vehicle, a person who caused a death while operating a motor vehicle could be charged with involuntary manslaughter and convicted only upon a showing of reckless or grossly negligent conduct. See, e. g.: *Commonwealth v. Kaulback*, 256 Pa.Super. 13, 389 A.2d 152 (1978); *Commonwealth v. Hinds*, 244 Pa.Super. 182, 366 A.2d 1252 (1976); *Commonwealth v. Greer*, 232 Pa.Super. 448, 335 A.2d 770 (1975).

Pa. 575, 155 A.2d 825 (1959); *Commonwealth v. Black*, supra; *Commonwealth v. Grant*, supra; *Commonwealth v. Bready*, 220 Pa.Super. 157, 286 A.2d 654 (1971). "When the words of a statute are clear and free from all possible ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b); *Commonwealth v. Mutnik*, 486 Pa. 428, 406 A.2d 516 (1979).

The language of the section defining homicide by vehicle is precise and unambiguous. As it pertains to the facts of the instant case, the only culpability required is a violation of a law "applying to the operation or use of a vehicle or to the regulation of traffic." Highway safety and the means for achieving it are legitimately, even uniquely, within the legislature's area of concern. *Maurer v. Boardman*, 336 Pa. 17, 7 A.2d 466 (1939), affirmed in *Maurer v. Hamilton*, 309 U.S. 598, 60 S.Ct. 726, 84 L.Ed. 969 (1940); *Commonwealth v. Funk*, 323 Pa. 390, 186 A. 65 (1936). Because automobiles are potentially hazardous instrumentalities, the legislature, in the public interest, may adopt traffic regulations and rules of the road reasonably calculated to promote care on the part of those who use its highways. *Hess v. Pawloski*, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091 (1927). Apparently alarmed by the deplorable carnage on our highways, the legislature determined that potential prosecution for involuntary manslaughter was an inadequate response. Motorists are generally reputable citizens. When one of them is involved in an automobile accident resulting in death to another person, the cause frequently is a negligent violation of a rule of the road or speed limit. A reckless disregard for the safety of others is frequently absent, and when it is present, it is often difficult to prove beyond a reasonable doubt. Therefore, the legislature determined to make criminal responsibility dependent upon violation of a traffic law and not necessarily on culpable or criminal negligence.[4]

4. Culpable or criminal negligence is defined in 18 Pa.C.S. § 302(b)(4): "A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure

Comparable statutes adopted in other jurisdictions have been similarly construed to eliminate a requirement for wanton or reckless conduct. See: *State v. Freeman*, 31 N.C.App. 93, 228 S.E.2d 516, *cert. denied*, 291 N.C. 449, 230 S.E.2d 766 (1976); *Pribyl v. State*, 165 Neb. 691, 87 N.W.2d 201 (1957); *State v. Kotapish*, 171 Ohio St. 349, 171 N.E.2d 505 (1960).[5] This court also, by a footnote in *Commonwealth v. Trainor*, 252 Pa.Super. 332, 337 n. 4, 381 A.2d 944, 947 n. 4 (1977), has acknowledged the legislature's intent to reduce the degree of culpability necessary to convict for homicide by vehicle.[6]

The language for Section 3732 of the Vehicle Code and similar statutory provisions in other states was derived from the Uniform Vehicle Code, Section 11–903(a), which provided as follows:

> "Whoever shall unlawfully and unintentionally cause the death of another person while engaged in the violation of any state law or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic shall be guilty of homicide when such violation is the proximate cause of death. . . . ."

to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation." It should be noted that the minimum culpability requirements contained in Section 302 of the Crimes Code, supra, afford appellee no support. These requirements have no application to "offenses defined by statutes other than [the Pennsylvania Crimes Code] in so far as a legislative purpose to impose absolute liability for such offenses or with respect to any material element thereof plainly appears." 18 Pa.C.S. § 305(a)(2).

**5.** After this decision, the Ohio statute was repealed and provisions defining the crimes of "aggravated vehicular homicide" and "vehicular homicide" were adopted which incorporated requirements for recklessness and negligence respectively. National Committee on Uniform Traffic Laws and Ordinances, *Traffic Law Annotated*, § 11–903 (1972 and Supp. 1976).

**6.** In *Trainor*, Judge Cercone, after reiterating the principle that not every violation of law in the operation of an automobile will render an operator criminally liable for deaths which may result, commented that the "vitality of this principle is cast in doubt as a result of the recently enacted Vehicle Code."

Under this section the gravamen of the offense was intended to be the violation of a traffic law which resulted in death. Thirty–four states and the District of Columbia enacted similar provisions. A substantial majority, however, included a requirement that the offending motorist's conduct must also be reckless. See: National Committee on Uniform Traffic Law Ordinances, *Traffic Laws Annotated*, § 11–903 (1972 and Supp. 1976). The history of the provision in other states merely confirms that the legislature in Pennsylvania deliberately chose to premise criminal responsibility solely upon a traffic violation.

This interpretation of Section 3732 is consistent with the recent decision of a panel of this Court in *Commonwealth v. Danchision*, 270 Pa.Super. 112, 410 A.2d 1274 (1979). (Opinion by Van der Voort, J., joined by Hester and Wieand, JJ.). The panel there held that the issue of homicide by vehicle had to be submitted to a jury where the Commonwealth's evidence reasonably supported a finding that defendant had violated a provision of the Vehicle Code and, as a result, had caused the death of another person.

Although the legislature has wide latitude in the enactment of strict liability statutes, its power to create such crimes is limited by due process requirements. *Smith v. California*, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). Nevertheless, where the statute involves what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable, and where adherence thereto can properly be expected of a person, a statute may validly eliminate the requirement of criminal intent. *United States v. Balint*, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922); *Shevlin–Carpenter Co. v. Minnesota*, 218 U.S. 57, 30 S.Ct. 663, 54 L.Ed. 930 (1910). See also: *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

Homicide by vehicle, as I have observed, is the legislature's response to a high fatality rate on the public highways. The standard adopted to define the offense, i. e., a violation of a traffic law that causes a death, is not unrea-

sonable. Motorists cannot justly complain that they will be held criminally accountable for the consequences if they violate the Vehicle Code. These factors, I believe, are controlling. Contrary to appellee's argument, the classification of the offense as a misdemeanor of the first degree and the fixing of a maximum sentence equivalent to that prescribed for involuntary manslaughter are not determinative.[7] These considerations must yield to the paramount interest of the legislature in establishing laws which regulate the operation of vehicles on the highways of the Commonwealth. In previous due process challenges to motor vehicle regulations, Pennsylvania courts have invariably upheld statutes that evidenced a reasonable relation to the legislative purpose and were not arbitrary or capricious. *Maurer v. Boardman,* supra; *Commonwealth v. Funk,* supra; *Commonwealth v. Arnold,* 215 Pa.Super. 444, 258 A.2d 885 (1969). I conclude that the offense of homicide by vehicle is not an unreasonable method to effectuate a legitimate state safety policy.

I express no opinion, of course, concerning the wisdom of the legislature's decision to provide criminal responsibility without recklessness or gross negligence. Neither do I express an opinion concerning the legislature's decision to classify homicide by vehicle as a criminal offense equal in seriousness to involuntary manslaughter.[8]

7.  The validity of strict liability statutes imposing comparable maximum penalties has been upheld in the following cases: *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) (misbranded or adulterated drugs–$1,000 and/or one year for first offense, $10,000 and/or three years for subsequent offense); *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (possession of unregistered firearms–$10,000 and/or ten years); *Williams v. North Carolina,* 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945) (bigamy–ten years); *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922) (unlawful drug sale–five years); *United States v. Ayo–Gonzalez,* 536 F.2d 652 (5th Cir. 1976) (fishing limit violation–$100,000 and/or one year).

8.  I observe, however, that the legislature's creation of the crime of "homicide by vehicle" has largely rendered the crime of "involuntary manslaughter" superfluous in cases where death results from a vehicular accident.

Appellee makes a facial attack on the validity of the statute by arguing that its language is vague and overbroad and, therefore, unreasonable. I conclude otherwise. In the first place, appellee has no standing to attack the statute facially. The Pennsylvania Supreme Court has held recently that, absent an assertion of an infringement of First Amendment freedoms, the challenged statute's specificity must be measured solely within the context of the facts of the case in controversy. *Commonwealth v. Hughes*, 468 Pa. 502, 508, 364 A.2d 306, 309 (1976); *Commonwealth v. Heinbaugh*, 467 Pa. 1, 4–5, 354 A.2d 244, 245 (1976). See: *United States v. Powell*, 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975); *United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). Because appellee does not claim any abridgement of First Amendment rights, I will not consider hypothetical situations in which the application of the statute might appear unreasonable.

Secondly, a statute is deemed unconstitutionally vague if persons of "common intelligence must necessarily guess at its meaning and differ as to its application. . . ." *Heinbaugh*, supra, 467 Pa. at 5, 354 A.2d at 245, quoting *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926). The statutory language of Section 3732 is neither vague nor ambiguous. To the contrary, the offense is defined in clear, intelligent and unmistakable terms: If a traffic law is violated and a death results, criminal responsibility follows.

The learned trial judge sustained a demurrer to the Commonwealth's evidence because there was no showing that appellee's traffic violation had been reckless or grossly negligent. By adding this requirement of culpability the court rewrote the applicable provision of the statute. The Commonwealth's evidence revealed that appellee had committed a stop sign violation which caused the death of a motorcyclist on the through street. This evidence should have been submitted to the jury. It was sufficient, if believed, to constitute the statutory offense of homicide by vehicle. See: *Commonwealth v. Danchision*, supra.

For these reasons, I would reverse and remand for a new trial.

PRICE and HESTER, JJ., join in this dissenting opinion.